IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ASCO HEALTHCARE, INC.           :
                                :
v.                              :        CIVIL NO. L-04-1419
                                :
HEART OF TEXAS HEALTH CARE      :
    AND REHABILITATION, INC., ET AL.:

**MEMORANDUM**

Pending in this breach of contract action are (i) Legacy Defendants' motion for summary judgment based on lack of personal jurisdiction and improper venue, and (ii) Plaintiff's motion for sanctions. For the reasons set forth below, the Court will, by separate Order, DENY both motions and send the case to full discovery.

**I.      Introduction**

Plaintiff, a Maryland company, sued the Texas-based Legacy Defendants for breach of contract. Legacy Defendants moved to dismiss for lack of personal jurisdiction and improper venue, contending that they have no contacts with Maryland and that a substantial part of the events or omissions giving rise to this lawsuit occurred in Texas. In reviewing the parties' briefs, the Court found that there were numerous factual issues that needed to be fleshed out in discovery. In a ten-page opinion dated December 22, 2004, the Court specifically pointed out the areas in which the record was insufficient. The Court ruled that Plaintiff could take jurisdiction- and venue-related discovery of Legacy Defendants, and it denied Legacy Defendants' motion, without prejudice to re-filing as a motion for summary judgment at the conclusion of such discovery.

Despite the fact that the parties had over six months to take discovery and prepare new briefs,[1] the record is still inadequate. Legacy Defendants made no effort to address the points raised in the Court's opinion. Rather, they simply re-filed the same brief that the Court had already labeled inadequate, changing the title to reflect that it was now a motion for summary judgment. Plaintiff contends that its efforts to provide additional information to the Court were stymied by Legacy Defendants' failure to provide adequate discovery responses. Nevertheless, Plaintiff never filed a motion to compel.[2] Rather, Plaintiff waited for the discovery period to close and then moved to strike the personal jurisdiction and venue defenses as a sanction for Legacy Defendants' discovery violations. Although fault lies with both parties, the holes in the record are primarily attributed to Legacy Defendants.

The Court will deny both motions and will send the case to full discovery on the merits. After the facts have been fully developed, Legacy Defendants will have an opportunity to raise the jurisdiction and venue defenses at the summary judgment stage.

## II. Background

### A. Facts

This case arises out of pharmaceutical contracts entered into between Plaintiff ASCO Healthcare, Inc. d/b/a NeighborCare ("Plaintiff" or "ASCO") and Defendant Heart of Texas Health Care and Rehabilitation, Inc. ("Heart of Texas") in the fall of 2002. ASCO, a Maryland

---

[1] Twice, the Court granted an extension of the discovery deadline and briefing schedule. Even with the extensions, Legacy Defendants still missed the deadline for filing their renewed motion and, with the Court's permission, filed the motion approximately three weeks late.

[2] Although the Court has the interrogatories and responses thereto, Plaintiff has not filed its requests for production of documents and the Legacy Defendants' responses. The Court, therefore, is not in a position to determine whether the Legacy Defendants' document production was deficient.

corporation with its principal place of business in Baltimore, was engaged in the business of providing pharmaceutical products and services. Heart of Texas operated six health care and rehabilitation facilities (the "Facilities")[3] in Texas, where Heart of Texas is incorporated and has its principal place of business.

### 1.   The Pharmacy Services Agreements

In fall 2002, ASCO and Heart of Texas entered into a Pharmacy Services Agreement with respect to each of the Facilities. (The agreements are collectively referred to herein as the "Pharmacy Agreements.")[4] ASCO was to provide pharmaceutical services to the Facilities and their residents for a two-year period, subject to renewal. The Pharmacy Agreements provided that ASCO would be the sole and exclusive provider of pharmaceutical services to the Facilities during the duration of the Pharmacy Agreements. Any sale of the Facilities would not constitute grounds for the termination or modification of the Pharmacy Agreements.

In addition, the Pharmacy Agreements specifically provided that any disputes arising under or related to the Pharmacy Agreements would be subject exclusively to the jurisdiction of this Court or the state court in Baltimore County, Maryland.

---

[3] The six facilities were: (i) Heart of Texas Health Care and Rehabilitation - Colonial located in Devine, Texas ("Colonial Facility"); (ii) Heart of Texas Health Care and Rehabilitation - Grace Ponds located in Fort Worth, Texas ("Grace Ponds Facility"); (iii) Heart of Texas Health Care and Rehabilitation - Kilgore located in Kilgore, Texas ("Kilgore Facility"); (iv) Heart of Texas Health Care and Rehabilitation - Mason located in Mason, Texas ("Mason Facility"); (v) Heart of Texas Health Care and Rehabilitation - Poteet located in Poteet, Texas ("Poteet Facility"); and (vi) Heart of Texas Health Care and Rehabilitation - Changing Seasons located in Vidor, Texas ("Changing Seasons Facility").

[4] The Pharmacy Agreements are attached as exhibits to Plaintiff's Amended Complaint. (See Docket No. 3.)

### 2. The Purchase Agreement

On September 17, 2003, prior to the expiration of the initial two-year term of the Pharmacy Agreements, Heart of Texas entered into an agreement (hereinafter the "Purchase Agreement") to sell the Facilities to Sam Jewell, a resident of Oklahoma.[5] The Purchase Agreement provided that Heart of Texas would sell the real property, personal property, assets, goodwill and other intangible property, and business associated with the Facilities to Jewell. Heart of Texas did not, however, assign the Pharmacy Agreements to Jewell.

The Purchase Agreement obligated Jewell or one of his "affiliate companies" to manage the Facilities from the date of execution of the Purchase Agreement until the closing date. The Purchase Agreement referenced Management Agreements entered into by Heart of Texas and Shady Grove Nursing Home, Inc., a Texas corporation wholly owned by Jewell. The Management Agreements were to govern the operations of the Facilities pending the closing date. Neither party has provided a copy of the Management Agreements to the Court.

In addition, the Purchase Agreement contemplated that Jewell would create seven new Texas corporations, referred to as "Buyer Entities," prior to the closing of the sale. One of the new corporations would serve as the parent company to the remaining six corporations. At the closing of the sale, Jewell would assign his rights and obligations under the Purchase Agreement

---

[5] The Purchase Agreement listed the following entities as the collective seller of the Facilities: (i) Changing Seasons Health Care & Rehabilitation Center; (ii) Devine-Colonial Park Health Care & Rehabilitation Center; (iii) Grace Ponds Health Care & Rehabilitation Center; (iv) Heart of Texas-Kilgore, Inc.; (v) Mason Health Care & Rehabilitation Center; and (vi) Poteet Health Care & Rehabilitation Center. The nature of these entities' relationship to Heart of Texas is unclear, but the parties do not appear to dispute that the entities were acting on behalf of Heart of Texas in selling the Facilities. (See Docket No. 23-3, at 3 (stating that Jewell negotiated with representatives of Heart of Texas for the purchase of the Facilities); Docket No. 25, at 3 (stating that Jewell entered into the Purchase Agreement with Heart of Texas).)

to the Buyer Entities on a "one Facility to each new Buyer Entity" basis.  The following five "Buyer Entities" are the "Legacy Defendants" in this case: (i) Devine Convalescent Care Center, Inc.; (ii) Fort Worth Manor, Inc.; (iii) Kilgore Manor, Inc.; (iv) Mason Convalescent Care Center, Inc.; and (v) Poteet Manor, Inc.

### 3. Events Between Execution of Purchase Agreement and Closing Date

Although the closing of the sale was originally scheduled to occur on October 29, 2003, it did not take place until February 4, 2004.  The record is unclear as to what transpired between September 17, 2003, the date on which the Purchase Agreement was executed, and February 4, 2004 (hereinafter the "Interim Period").  For example, it is not clear when Jewell created the Legacy Defendants; who managed the Facilities during the Interim Period; and whether Jewell, the Legacy Defendants, Heart of Texas or another entity ordered and received pharmaceutical products from ASCO during the Interim Period.  The parties do not dispute, however, that in January 2004, Jewell called ASCO and terminated the Pharmacy Agreements, effective February 4, 2004.  Jewell stated in an interrogatory response that he placed this call to one of ASCO's Texas offices.[6]

### B. ASCO's Amended Complaint

ASCO claims that the Legacy Defendants assumed Heart of Texas's obligations under the Pharmacy Agreements and placed orders with ASCO during the Interim Period.  According to ASCO, when Jewell terminated the Pharmacy Agreements, a substantial balance was due for (i) products ordered before the execution of the Purchase Agreement, which are chargeable to Heart of Texas; and (ii) products ordered after the execution of the Purchase Agreement, which

---

[6] See Docket No. 53, Ex. B, Interrog. Resp. No. 12.

are chargeable to the Legacy Defendants.  ASCO also claims that Heart of Texas and Legacy Defendants owe it liquidated damages for the early termination of the Pharmacy Agreements.  ASCO, therefore, filed this lawsuit against Heart of Texas[7] and the Legacy Defendants, asserting various breach of contract claims.

### C. Legacy Defendants' Motion to Dismiss and the Court's December 22, 2004 Memorandum and Order

The Legacy Defendants moved to dismiss for lack of personal jurisdiction and improper venue.  In considering the motion, the Court found that it was unclear whether the Legacy Defendants have ever had any contacts with ASCO or any other entities in Maryland and whether any acts leading up to the lawsuit, other than execution of the Pharmacy Agreements, took place in Maryland.  The unknown facts identified by the Court included the following:

(i) although it did not appear from the record that the Legacy Defendants were parties to the Management Agreements, neither party had provided a copy of the Management Agreements to the Court.  Accordingly, it was unclear whether the Management Agreements contemplated: (a) that the Legacy Defendants would assume any responsibility for managing the Facilities, and (b) that managing the Facilities included purchasing supplies from ASCO pursuant to the Pharmacy Agreements;

(ii) whether the Legacy Defendants engaged in transactions with ASCO, a Maryland company, to obtain pharmaceutical goods and services for the Facilities during the Interim Period; and

(iii) whether, regardless of the terms of the Management Agreements, (a) Jewell or the Legacy Defendants engaged in any transactions with ASCO, and (b) if Jewell did engage in such transactions, he was acting on behalf of the Legacy Defendants.

### D. Discovery

---

[7] Heart of Texas did not respond to the Amended Complaint and is, therefore, in default.

During the discovery period, Plaintiff served Legacy Defendants with 22 interrogatories and 15 requests for production of documents. In addition, Plaintiff deposed Sam Jewell. As discussed below, the information revealed during discovery does not sufficiently answer the Court's questions.

### III. Standard of Review

Plaintiff bears the burden of proving jurisdiction and venue.[8] "If the existence of jurisdiction turns on disputed factual questions the court . . . may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989).

### IV. Analysis

#### A. Discovery Responses and Briefs Insufficient

Essentially, the Court wanted to know (i) what the Management Agreements stated, (ii) whether Legacy Defendants were involved in managing the Facilities during the Interim Period, and (iii) whether during the Interim Period, Legacy Defendants had any contact with ASCO. Legacy Defendants' discovery responses and the parties' briefs fail to answer these questions.

First, although at least one of the Management Agreements was produced in discovery,[9]

---

[8] See Bartholomew v. Virginia Chiropractors Ass'n, Inc., 612 F.2d 812, 816 (4th Cir. 1979), cert. denied, 446 U.S. 938 (1980), overruled on other grounds by Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119 (1982); Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989).

[9] See Docket No. 54 at 2 (stating that Legacy Defendants produced copies of the Management Agreements for the Fort Worth Manor and Kilgore Manor Facilities).

neither party has provided a copy to the Court or summarized its provisions.  Second, although the parties talk about Jewell's managerial responsibilities, nowhere do they clarify whether Jewell was acting as an agent for Legacy Defendants.  It is still unclear whether it was Jewell's company, Shady Grove Nursing Homes, Inc., that was solely responsible for managing the Facilities or whether Legacy Defendants likewise had a role.  Third, although Plaintiff bears the burden of proving jurisdiction and venue, Plaintiff has made only bare allegations that Legacy Defendants were operating the nursing homes and ordering pharmacy products from ASCO.[10]  If ASCO continued to provide pharmacy supplies to the Facilities during the Interim Period, ASCO should have its own records regarding who paid the invoices.  ASCO, however, has not provided such records to the Court.

Fourth, Legacy Defendants' discovery responses are vague and, at times, contradict Jewell's deposition testimony.  For example, a standard interrogatory response was: "At no time did Jewell or any agent or representative of the defendants or the Buying Entities have any communication or contact of any kind with any person or entity located or domiciled in the State of Maryland regarding the purchase, management, or operation of the Subject Facilities." (Docket No. 53, Ex. B.)  This reveals nothing about whether Legacy Defendants ever contacted ASCO to purchase pharmaceutical products.

In several interrogatory responses, Legacy Defendants explicitly denied having any

---

[10] During discovery, Legacy Defendants stated that in November 2003 (which was during the Interim Period), they were licensed to operate the Facilities.  (See Docket No. 52, Ex. A.)  ASCO cites to these licenses, stating that Legacy Defendants "appear to have operated the nursing facilities" during the Interim Period.  (Docket No. 52, at 3.)  Despite the existence of the licenses, it is still unclear who was managing the Facilities.

-
-

contact with ASCO, or any other Maryland company, regarding pharmaceutical products.[11] (Docket No. 53, Ex. B, Interrog. Resp. Nos. 10, 11.)  However, they later qualified this statement by saying "except and to the extent such [contact] may have been made as the agent of the Selling Entities."  (Docket No. 53, Ex. B, Interrog. Resp. No. 17.)  Legacy Defendants fail to analyze how their agency status affects the personal jurisdiction and venue issues.

Jewell's deposition testimony likewise raises the possibility that Legacy Defendants may have had some contact, albeit minimal, with ASCO.  Jewell stated that, pursuant to his management responsibilities, he wrote checks to pay the Facilities' vendors, including "whatever pharmacy" was listed in the Facilities' "budgets."[12]  (Docket No. 53, Ex. C, at 28, 33.)  He then conceded that, without looking at the business records, he has no idea whether he wrote any checks to ASCO.  (Docket No. 53, Ex. C, at 46.)  Although Jewell could locate records that show which vendors he wrote checks to during the Interim Period,[13] he had not reviewed those records

---

[11] Legacy Defendants stated that during the Interim Period, the employees "then in place" continued to operate and manage the Facilities, including paying invoices for pharmaceutical and other supplies. (Docket No. 53, Ex. B., Interrog. Resp. Nos. 7-9.)  There are several problems with this statement.  First, it does not identify whether the employees "then in place" continued to be employed by Heart of Texas or became employees of Legacy Defendants or some other entity during the Interim Period.  Second, if they remained employees of Heart of Texas and continued to manage the Facilities during the Interim Period, then what was the purpose of the Management Agreement?  Third, it contradicts other interrogatory responses and deposition testimony to the effect that Jewell paid invoices on behalf of the Facilities.  (See Docket No. 53, Ex. B., Interrog. Resp. No. 8; id., Ex. C, at 27-28.)

[12] Jewell stated that he paid the invoices from money that the Facilities placed into Shady Grove's account.  Again, although it appears that Shady Grove was primarily responsible for managing the Facilities during the Interim Period, Plaintiff has not sued Shady Grove, and it is unclear what role, if any, Legacy Defendants had.

[13] See Docket No. 53, Ex. C, at 46-48, 71-73 (stating that he could probably locate bank statements and checkbook registers and that information about vendors during the Interim Period is located at the nursing homes).

prior to his deposition and has not turned them over to Plaintiff.[14]

Finally, of the documents that Legacy Defendants did produce, some are incomplete. Although there are six Facilities, Legacy Defendants provided Plaintiff with the Management Agreement for only two Facilities.[15] In opposing Plaintiff's motion for sanctions, Legacy Defendants provided the Court with a Medicaid Cost Report for Poteet Manor, Inc.[16] Although the report states that the Facility claimed $5,518 in expenses for drugs and pharmaceuticals during 2004 (which included the Interim Period), Legacy Defendants failed to attach the required schedule supporting those costs. (See Docket No. 54, Ex. C.) It is possible that the schedule may contain some information regarding which company supplied the pharmaceuticals.[17]

For these reasons, the Court finds that the record is still insufficient for the Court to resolve the jurisdiction and venue issues. Accordingly, the Court will DENY Legacy Defendants' motion for summary judgment.

---

[14] In opposing Plaintiff's motion for sanctions, Legacy Defendants filed an affidavit prepared by Jewell, in which he states that he did not write any checks to ASCO or to any person or entity in Maryland. (Docket No. 54, Ex. A, ¶ 4.1.) It appears, however, that Jewell still has not reviewed the checks or the checkbook registers to determine the vendors to whom he wrote checks. (See id. (stating that he believes he has the checks and checkbook registers in storage).) It is unclear, then, how he is now certain that he never wrote a check to ASCO when he was uncertain during his deposition.

[15] See Docket No. 54 at 2 (stating that Legacy Defendants produced copies of the Management Agreements for the Fort Worth Manor and Kilgore Manor Facilities).

[16] Legacy Defendants do not mention the Medicaid Cost Reports for the other Facilities.

[17] ASCO argues that Poteet Manor, Inc. acknowledges in the Medicaid Cost Report that it had contractual obligations to ASCO during 2004. There is no support for this statement. ASCO has not pointed to a specific page on which ASCO is mentioned, and, in briefly reviewing the 59-page report, the Court did not see any mention of ASCO. Although ASCO stated that the missing Schedule G "might well shed at least a bit of light on the pharmacy costs Poteet acknowledges it incurred," that schedule was omitted from the copy provided to the Court. (See Docket No. 56, at 2 n. 1.)

### B.   Plaintiff's Motion for Sanctions

Noting the deficiencies in Legacy Defendants' discovery responses and the failure to produce relevant business records, Plaintiff asks the Court to sanction Legacy Defendants by striking their jurisdiction and venue defenses.  In the alternative, Plaintiff asks the Court to shift the burden of proof on the jurisdiction and venue issues to Legacy Defendants.  The Court will not impose the requested sanctions.

First, Plaintiff has not provided the Court a copy of its requests for production of documents and the Legacy Defendants' responses.  The Court, therefore, cannot determine whether the documents that were withheld were within the scope of any document requests.

Second, Plaintiff never filed a motion to compel.  To properly challenge the adequacy of discovery responses, a party must comply with the procedures set forth in Local Rule 104.8 regarding filing a motion to compel.  Rather than bring the discovery problems to the Court's attention in a timely manner, Plaintiff waited until the briefing stage to raise the discovery issues.

Accordingly, the Court will deny the motion for sanctions.

### C.   Full Discovery and Schedule

Because the limited discovery and additional briefing allowed by the Court proved to be ineffective at resolving the factual issues, the Court will send the case to full discovery on the merits.[18]  After discovery closes and the facts have been fully developed, Legacy Defendants may raise the jurisdiction and venue defenses anew in a motion for summary judgment that specifically addresses the unresolved factual issues discussed in the instant Memorandum and in

---

[18] See Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989) ("If the existence of jurisdiction turns on disputed factual questions the court . . . may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question.").

the Court's December 22, 2004 Memorandum.

The facts necessary to decide the jurisdiction and venue defenses are tied to the underlying merits of the breach of contract claims,[19] so full discovery should assist the parties and the Court in analyzing the defenses. Also, regardless of whether the case is eventually tried in Maryland or Texas, the parties would need to conduct full discovery. Thus, even if the case is tried in Texas, the discovery conducted in this Court would not be wasted.

### 1. Motion to Compel

If Plaintiff wishes to file a motion to compel responses to the discovery requests that it served during the limited discovery period, the following schedule applies:

| | |
|---|---|
| April 7, 2006: | Plaintiff shall serve the motion to compel on Legacy Defendants |
| April 14, 2006: | Legacy Defendants shall serve Plaintiff with their opposition brief |
| April 21, 2006: | Plaintiff shall serve Legacy Defendants with their reply brief |
| April 28, 2006: | Deadline for the parties to hold the Rule 104.7 conference and for Plaintiff to file the Local Rule 104.7 certification. |

Although this schedule is a truncated version of that laid out in Local Rule 104.8, the Court directs the parties' attention to that rule, which describes the procedures for serving and briefing motions to compel.

### 2. Full Discovery

The discovery and related deadlines are set forth in the Scheduling Order that the Court is entering under separate cover.

---

[19] For example, whether Legacy Defendants had a role in managing the Facilities and obtaining pharmaceutical products from ASCO is relevant to the issues of (i) whether Legacy Defendants had any contact with ASCO, a Maryland company, and (ii) whether Legacy Defendants assumed the Pharmacy Contracts and are liable for their breach.

12

The interrogatories and requests for production of documents that Plaintiff served on Legacy Defendants during the limited discovery period do not count toward Plaintiff's total discovery requests permitted by the Federal Rules of Civil Procedure and the Local Rules. Likewise, the time Plaintiff spent deposing Sam Jewell in April 2005 does not count toward the ten deposition hours permitted in the Scheduling Order.

When Legacy Defendants respond to Plaintiff's document requests, they shall also produce the following:

    (i)    the Management Agreement for each Facility;

    (ii)    the complete 2003 and 2004 Medicaid Cost Reports for each Facility, including all schedules;

    (iii)    documents showing who ordered pharmaceutical products on behalf of the Facilities during the Interim Period;

    (iv)    documents showing from which company the pharmaceutical products were purchased;

    (v)    documents showing who wrote checks to pay for the pharmaceutical products;

    (vi)    copies of checks used to pay vendors during the Interim Period and the corresponding checkbook registers;

    (vii)    copies of the "budgets" referred to by Jewell at page 33 of his deposition transcript;

    (viii)    any documents that reflect what role, if any, Legacy Defendants had in managing the Facilities during the Interim Period; and

    (ix)    correspondence between Eaton Vance, the Facilities' administrators, or the Facilities' employees and Jewell, Shady Grove Nursing Home, Inc., or Legacy Defendants regarding the payment of pharmaceutical invoices during the Interim Period. This includes any requests that Jewell, Shady Grove Nursing Home, Inc., or Legacy Defendants issue a check to a company that provided pharmaceutical services or products.

The Court expects Legacy Defendants to diligently search for these documents. If they

cannot produce one or more of these documents, they must explain in writing to Plaintiff and to the Court why they cannot locate them.

## V.     Conclusion

For these reasons, the Court will, by separate Order, (i) DENY Legacy Defendants' motion for summary judgment, (ii) DENY Plaintiff's motion for sanctions, and (iii) send the case to full discovery. The Court will enter a Scheduling Order under separate cover.

Dated this 31st day of March, 2006.

_____/s/_____
Benson Everett Legg
Chief Judge